## In re CORRUGATED CONTAINER ANTITRUST LITIGATION.

### ADAMS EXTRACT CO., et al., Plaintiffs-Appellees,

Great Northern Packaging Corp., et al., CFS Continental, Inc., et al., Rossville Packing Co., et al., Andre-Boudin Bakeries, Inc., et al., Townhouse Furniture, et al., Denver Meat Co., et al., Carron Manufacturing Co., Ilikon Corp., Wittek Golf Supply Co., Inc., Plaintiffs-Appellants-Appellees,

v.

PLEASURE HOURS, INC., et al., St. Joe Paper Co., The Continental Group, Olinkraft, Inc., Container Corporation of America, The Chesapeake Corporation of Virginia, Owens-Illinois, Inc., MacMillan Bloedel, Inc., Inland Container Corp., Menasha Corp., U. S. Corrugated Fibre-Box Co., Stone Container Corp., Defendants-Appellants-Appellees.

### In re CORRUGATED CONTAINER ANTITRUST LITIGATION.

ADAMS EXTRACT CO., et al.,
Plaintiffs-Appellees,

CFS Continental, Inc., et al., Townhouse Furniture, et al., Rossville Packing Co., et al., Denver Meat Co., et al., Carron Manufacturing Co., Andre-Boudin Bakeries, Inc., Ilikon Corp., Great Northern Packaging Corp., et al., Plaintiffs-Appellants-Appellees,

Pleasure Hours, Inc., et al., London Dry Ltd., et al., Plaintiffs-Objectors-Appellants-Appellees,

v.

The CHESAPEAKE CORPORATION OF VIRGINIA, et al., Stone Container Corp., Defendants-Appellants-Appellees.

United States Court of Appeals,
Fifth Circuit.

April 3, 1981.

Aram A. Hartunian, Marshall Patner, Pressman & Hartunian, Chtd., Chicago, Ill., Michael Perrin, Wayne Fisher, Fisher, Rock & Gallagher, Houston, Tex., for Great Northern Packaging Corp.

Granvil I. Specks, Perry Goldberg, Gary L. Specks, Specks & Goldberg, Chicago, Ill., for CFS Continental, Inc. et al.

Michael J. Freed, Joseph A. Ginsburg, Levin, Ginsburg & Novoselsky, Lawrence H.

Eiger, Muchy, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., for Rossville Packaging Co., et al.

R. Clifford Potter, Dennis P. W. Johnson, Bell, Boyd & Lloyd, Chicago, Ill., for Boise Cascade Corp.

James B. Sloan, Michael P. Connelly, Sloan & Connelly, Chicago, Ill., for Ilikon Corp.

Phillip C. Goldstick, Goldstick & Smith, Chicago, Ill., for Wittek Golf Supply Co.

Fletcher H. Etheridge, Houston, Tex., for Alton Box Board Co., et al.

Richard N. Carrell, Houston, Tex., for St. Joe Paper Co.

Bader & Bader, White Plains, N. Y., for London Dry Ltd. and Pleasure Hours, Inc., et al.

Guido Saveri, Saveri & Saveri, San Francisco, Cal., for Andre-Boudin Bakeries, Inc. et al.

Ellis Sostrin, Sostrin & Walner, Chicago, Ill., for Townhouse Furniture et al.

Robert H. Weir, San Jose, Cal., for Denver Meat Co., et al.

Lawrence Walner, Chicago, Ill., Leonard Barrack, Barrack, Rodos & McMahon, Philadelphia, Pa., for Carron Mfg. Co.

W. Donald McSweeney, Thomas P. Luning, Janet M. Koran, Schiff, Hardin & Waite, Chicago, Ill., for Continental Group, Inc.

C. Kenneth Shank, Jr., New York City, for Olinkraft, Inc.

David E. Bennett, Chicago, Ill., for Container Corp. of America.

Thomas G. Slater, Jr., Ray V. Hartwell, III, Douglas W. Kenyon, Richmond, Va., John D. Roady, Houston, Tex., for Chesapeake Corp. of Va.

John D. Roady, Lynda M. Jenkins, Hutcheson & Grundy, Houston, Tex., for Owens-Illinois, Inc.

MacDonald Flinn, New York City, for MacMillan Bloedel, Inc.

David T. Hedges, Jr., Houston, Tex., for Inland Container Corp.

Stephen D. Susman, Susman & McGowan, Houston, Tex., Vance K. Opperman, McGovern, Opperman & Paquin, Minneapolis, Minn., Allen D. Black, Fine, Kaplan and Black, Philadelphia, Pa., Jerry S. Cohen, Kohn, Milstein & Cohen, Washington, D. C., H. Laddie Montague, Jr., Berger & Montague, P.C., Philadelphia, Pa., Charles D. Kipple, Saccomanno, Clegg, Martin & Kipple, Houston, Tex., Kenton C. Granger, Anderson, Granger, Nagels & Lastelic, Overland Park, Kan., Lowell E. Sachnoff, Sachnoff, Schrager, Jones, Weaver & Rubenstein, Ltd., Jack Corinblit, Corinblit, Shapero & Seltzer, Los Angeles, Cal., for Adams Cal., Lawrence J. Hayes, Maun, Green, Hayes, Simon, Aretz and Murray, St. Paul, Minn. for Adams Extract Co., et al.

Henry L. King, Davis, Polk & Wardwell, New York City, for International Paper Co.

William A. Stearns, Milwaukee, Wis., for Menasha Corp.

David Bland, Houston, Tex., for U. S. Corrugated Fibre-Box Co.

Robert J. Malinak, Houston, Tex., Gottlieb & Schwartz, Chicago, Ill., for Stone Container Corp.

John H. Morrison, Jeffery M. Cross, G. Christian Kronberg, Kirkland & Ellis, Chicago, Ill., for Weyerhaeuser Co.

Thomas P. Hanrahan, Kirkland & Ellis, Chicago, Ill., for Willamette Industries, Inc.

Michael H. King, Alexander R. Domanskis, Eric S. Palles, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for Cons. Packaging Corp.

Kael B. Kennedy, Arthur W. Hahn, Lee Ann Watson, Katten, Muchin, Gitles, Zavis, Pearl & Galler, Chicago, Ill., for Interstate Container Corp.

---

1. The district court proceedings have already generated the following decisions: *In Re Corrugated Container Antitrust Litigation,* 606 F.2d 319 (5th Cir. 1979) (appeal dismissed without published opinion); *In Re Corrugated Antitrust Litigation,* 611 F.2d 86 (5th Cir. 1980); *In Re*

*Corrugated Container Antitrust Litigation,* 614 F.2d 958 (5th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 244, 66 L.Ed.2d 114 (1980); *In Re Corrugated Container Litigation,* 620 F.2d 1086 (5th Cir. 1980).

Before TJOFLAT, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.

TJOFLAT, Circuit Judge:

The appellate saga of the Corrugated Container antitrust litigation continues.[1] In this chapter, we consider two district court orders approving settlements between plaintiff-class representatives and twenty-four of the thirty-seven defendants.[2] The appellants in this appeal include two groups of dissident plaintiffs who argue that the settlements are invalid and must be set aside, and that even if they are valid, the formula by which they are to be distributed must be modified; a third group of plaintiffs who ask us to void those parts of the settlement that prevent them from pursuing state law remedies based on the same operative facts that underlie the settled federal claims; a fourth group of plaintiffs (comprised of one of the first two groups and the third group) who claim the notice informing the class of the settlement was defective; and various defendants who ask that we delay either approval of the settlements or distribution of the settlement proceeds[3] until there is final judicial clarification of the rights of non-settling defendants to bring actions for contribution against the settling defendants.[4] None of these arguments persuades us that the settlements must be set aside or modified; we are, however, in agreement with certain objectors that the district court's findings are insufficiently detailed to allow us to determine whether the district court abused its discretion in concluding that the terms of the settlements, and the plan to distribute the settlement proceeds to class members, are fair, reasonable and adequate.[5] We therefore remand the case to the district court for more detailed findings explaining its approval of the settlements. We retain jurisdiction during this limited remand.

I
*The Facts*

We begin with a description of this litigation's general history. In 1976, the government convened a grand jury to investigate possible criminal antitrust violations occurring in the corrugated container industry. Several purchasers of corrugated containers and corrugated sheets subsequently filed treble damages actions against thirty-seven defendants under section 4 of the Clayton Act, 15 U.S.C. § 15 (1976). These cases, most of which were class actions, were consolidated in the Southern District of Texas in the fall of 1977. On December 6, 1977, the District Court ordered the formation of a plaintiffs' steering committee consisting of thirteen of the lawyers for plaintiffs in the consolidated actions. The district court order vested the committee with broad authority to control the continuing conduct of plaintiffs' cases; this authority included the power to enter into settlement discussions with interested defendants.

On January 25, 1978, the grand jury returned indictments against fourteen of the defendants. The indictments charged that these defendants (and several individuals who had been employed by the defendants) conspired to fix corrugated container and sheet prices between 1960 and 1974.

In addition to the consolidated antitrust actions described, a group of container purchasers filed a state-law antitrust action in the Court of Common Pleas for Spartanburg County, South Carolina. The defendants in this action were also defendants in the consolidated cases. The state-court plaintiffs in these actions resisted efforts to remove their case to federal court, where it would have been transferred to the Southern District of Texas for consolidation. After successfully resisting removal, the plaintiffs moved the South Carolina court to enjoin the defendants from entering a set-

2. Since the district court issued the orders involved in this appeal, twelve more defendants have settled. After this appeal was taken, the remaining defendant proceeded to trial before a jury and was found liable to plaintiffs.

3. Amounts paid toward the settlement have been deposited in an escrow account pending resolution of this appeal.

4. These settling defendants claim that in the event they are held liable for contribution, they could rescind the settlement under the doctrine of commercial frustration.

5. We find the court's findings on matters other than the terms of the settlement adequate. Thus, we are able to affirm the court's rejection of settlement attacks premised upon attorney conflicts of interest or the lack of presettlement discovery.

tlement with the federal plaintiffs that released the South Carolina claims. This motion was granted.

In March 1978, plaintiffs in forty of the pending consolidated cases filed a single complaint (in the suit now before us) on behalf of all purchasers of corrugated container and sheet products. Soon thereafter, a motion for certification of a class was filed. The motion had not been ruled upon when, on July 28, 1978, Great Northern Packaging Corporation (Great Northern) and Huron Packaging Corporation (Huron), purchasers of sheets, filed a separate antitrust class action in the United States District Court for the Southern District of Texas against the defendants named in the unified class action. The plaintiff class in this new suit, however, was definitionally limited to sheet plants, that is, sheet purchasers who fabricate containers from their purchases. According to Great Northern and Huron, container purchasers rather than sheet plants had filed, and were prosecuting, the earlier consolidated actions.

Here we digress to consider the differences between the two purported classes. To do this, we must first look at the corrugated container industry. There are three steps in the manufacture of corrugated containers. In the first step, wood pulp is converted into containerboard. In the second step, the containerboard is confected into corrugated sheets. And, finally, in the third step, the sheets are fabricated into containers. The defendants in this appeal perform all three of these functions; that is, they begin with wood pulp and wind up with corrugated boxes. They are thus fully integrated operations.

The defendants sell their finished corrugated boxes to purchasers ranging from "ma and pa" grocery stores to such multinational corporations as Xerox Corporation. This group of purchasers composes the class denominated as container purchasers.

The defendants also sell corrugated sheets to independent enterprises that fabricate and sell their own containers.[6] These corrugated sheet purchasers comprise the sheet plant class. It should be noted that many container purchasers purchase some sheets, and, similarly, many sheet plants will purchase finished containers.

The various actions that had been consolidated, with one exception [7], had been filed by container purchasers. Most of these actions, however, were class actions, and the class definitions were arguably broad enough to include sheet plants. In any event, the plaintiffs' steering committee that was formed pursuant to the district court's December 6, 1977, order was composed entirely of lawyers for container purchasers.

During the summer of 1978, and prior to class certification, the steering committee entered into settlement discussions with St. Regis Paper Corporation, which had not been indicted in the criminal case. These discussions culminated in St. Regis agreeing to pay $1.7 million, which represented $428,000 for each percentage point of the corrugated container market (market point) controlled by St. Regis, to settle the claims against it. St. Regis also made certain concessions and agreed, orally, to cooperate in plaintiffs' discovery effort.[8] Later that

---

**6.** The container purchasers who buy from these independent fabricators are different from those that purchase from defendants, although there is some overlap between the two groups.

**7.** After the initial consolidation of the various pending actions, and after the formation of the plaintiffs' steering committee, five container purchasers and one sheet plant, Atlas Container Corporation, filed still another federal antitrust suit against the defendants. This case was transferred to the Southern District of Texas to be consolidated with the other cases.

**8.** At the time of the settlement, Congress was considering legislation that could have conferred standing on indirect purchasers to pur-

sue price-fixing claims and, concomitantly, to permit defendants to assert a pass-through defense against price fixing claims waged by direct purchasers. Plaintiffs represented to the district court that St. Regis, in negotiations, sought to obtain the right to rescind the settlement if such legislation was enacted and exposed it to a possibility of double liability. The negotiated settlement, however, provides a right to rescission only if such legislation were to be enacted before December 31, 1978.

A second concession was that St. Regis had no right of rescission in the event the class was not certified or, if certified, later decertified. The settlement was, however, contingent on

summer, plaintiffs concluded a second settlement, with International Paper, which had been indicted in the criminal case. International Paper agreed to pay $8.3 million, which reflected $1 million for each percentage point of the corrugated market controlled by the company.[9]

At the time the steering committee negotiated the aforementioned settlements, it had undertaken no discovery going to the merits of the case. (Such discovery was effectively precluded by restrictions imposed by the district court during the pendency of the criminal prosecution.) The steering committee had available to it certain information, however, which, according to the settlement proponents, was adequate for it to make an informed judgment concerning the value of the claims.[10]

On September 6, 1978, after the first two settlements had been concluded, the district court entered an order certifying a single class in the consolidated litigation. Great Northern believed the parameters of the class were imprecisely drawn and, in particular, ambiguous concerning whether sheet plants were included in the class. In response to these concerns, Great Northern, on October 6, 1978, filed a motion to clarify the class definition by excluding sheet plants, or, alternatively, to create a subclass for sheet plants. The court took this motion under advisement. Then, on October 26, 1978, without ruling on Great Northern's motion, the district court designated representatives of the class it had already certified. These class representatives included Atlas Container Corporation, which represented itself as a sheet plant.[11]

The class representatives immediately embarked on an exploration of further settlement possibilities. This led, in December, to settlements with seven additional unindicted defendants. These settlements ranged from $2 million per market point to $2.75 million. In addition, a misdemeanor indictee settled for $3.5 million per point, and a felony indictee for $4.5 million.

On December 26, 1978, the district court responded to Great Northern's motion by certifying two subclasses, one of container purchasers and the other of sheet plants. The court named Great Northern as one representative of the sheet plant subclass; Atlas Container, which previously had been designated a class representative, was also named a sheet plant representative.[12] With the exception of Atlas Container, the representatives of the container purchaser subclass were the plaintiffs who had been designated on October 26, 1978 to represent the initial unitary class. Also on December 26, the two subclasses declared moratoriums on further negotiations.

The container purchasers lifted their moratorium on January 5, 1979, and throughout

---

the court's initial approval of a settlement class of plaintiffs.

**9.** The terms of International Paper's settlement were similar to those agreed to by St. Regis. See note 8, *supra*. The discovery concessions, however, were reduced to writing.

**10.** In urging the district court to accept the settlements, the steering committee claimed it had had access to the following sources of information:

(a) The indictments and, in the case of International Paper, the extensive bill of particulars filed recently by the Government in the criminal case.

(b) Documents produced by defendants to the Houston Grand Jury.

(c) Extensive memoranda and affidavits submitted by defendants in response to plaintiffs' class action motion.

(d) Motions and memoranda filed by defendants in the criminal case.

(e) Statistics of the Fiber Box Association relating to sales of corrugated containers and sheets.

(f) Arthur Andersen reports relating to economic conditions in the corrugated products industry.

(g) The opinion and record in *United States v. Container Corporation of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), and the opinion in *United States v. Consolidated Packaging Corporation,* 575 F.2d 117 (7th Cir. 1978).

Record Excerpts at 276 (footnote omitted).

**11.** See note 7, *supra*.

**12.** The attorney for Atlas, who had also been representing five container purchasers, withdrew his representation of the container purchasers.

the month conducted settlement discussions, but strictly on behalf of their subclass. This created a problem for defendants, who desired settlements that would release them from the claims of both subclasses. This problem was compounded by the container subclass's per-point dollar demands, which were in excess of what the single class had received in the December settlements. Defendants refused to negotiate on these terms, at least without the sheet plants' participation in the discussions.

The sheet plants, however, were unwilling to discuss settlement pending resolution of their investigation into damages suffered by their class. In order to break the resulting deadlock between the container class and defendants, a compromise was reached. The compromise was that a portion of any negotiated settlement would be available to the sheet class if the sheet class applied to participate in it, thus providing the defendants a possibility that the settlement they negotiated would release both subclasses' claims.[13] Eleven settlements, ranging from $1.5 million to $4 million per point, were negotiated on these terms.[14]

Late in January, the two classes negotiated additional settlements with two defendants who claimed an inability to pay large amounts in settlement because of borderline solvency. The plaintiff classes retained two accounting firms to investigate these hardship claims. After the firms reported that the claims were founded in fact, the plaintiffs settled at rates lower than those used in earlier settlements.

The criminal trial immediately followed these settlements, and no further settlements were reached while the trial was in progress. In April, 1979, the jury returned a verdict of not guilty against the defendants who stood trial. (Several of the indict-ed defendants had previously pleaded nolo contendere.)

On April 16, 1979, the plaintiff class representatives filed a motion for preliminary approval of the settlements. Several members of each of the two subclasses opposed the motion. Among the objections were that the settlements were contaminated by conflicts of interest; that the dollar amounts were inadequate; that even if the post-class certification settlements were adequate in amount, the pre-certification settlements with St. Regis and International Paper were clearly inadequate; that the negotiating attorneys lacked data necessary to evaluate the settlements; and that the objectors were denied the right to explore the settlement negotiations through discovery. By order dated May 30, 1979, the district court rejected these objections as obstacles to preliminary settlement approval, and held that "these settlements are within the range of possible approval and that notice of them should be given to the class members." In Re Corrugated Container Antitrust Litigation, 1979–1 Trade Reg.Rep.(CCH) ¶ 62,690 at 77,881 (S.D.Tex. 1979).

The class representatives thereafter sent a single notice to the class members, advising them they were potential members of a class and that settlements with 24 of the defendants had been reached and preliminarily approved by the court. The notice indicated that the total value of the settlements was $300,000,000. Recipients of the notice were given options of participating, of opting out of the class, or of participating in the class but objecting to the settlements. The sheet plant and South Carolina objectors contended that the notice was defective because it omitted relevant information concerning the settlements and because separate notices should have been used to advise the class of the pendency of the

---

**13.** If the sheet subclass elected not to participate, the container class would receive the entire settlement proceeds, even that portion earmarked for the sheet plants; the sheet plants could proceed to trial.

**14.** The sheet plant subclass representatives voted two votes to one to participate in the settlements; after inter-class negotiation, it was agreed that $11 million would be earmarked for sheet plant claims. The sheet plant objectors challenge the sheet plant participation in these settlements in a separate appeal docketed at 80–1476, 80–1521. The briefing on that appeal was not completed until after the issues on this appeal had been briefed and orally argued.

actions and of the proposed settlements. In any event, the vast majority of potential class members chose to participate in the class, and only a very small percentage of the class members objected to the settlements.

The court, on December 3 and 4, 1979, presided over a hearing on whether final approval should be given to the settlements. At this hearing, the objections to the settlements raised at the preliminary approval stage were renewed. In addition, new objections were raised. Several defendants objected to approval of the settlements prior to final judicial resolution of the validity of the claims for contribution that certain non-settling defendants had raised against them; other defendants requested that the court approve the settlements, but delay distribution of the proceeds until judicial resolution of the contribution issue, thus preserving the assets until such time as a right of rescission might arise. The group of plaintiffs that had filed an antitrust action in South Carolina objected to a settlement provision releasing state law claims. Some sheet plants objected to the manner in which the proceeds were to be divided between the subclasses; some container purchasers made similar objections. The district court, nonetheless, approved the settlements and the objectors have brought this appeal.

We discuss these various objections in the following sections of this opinion. Before beginning this discussion we add, parenthetically, that since the district court's approval of these settlements, twelve of the then thirteen non-settling defendants settled their lawsuits. The plaintiffs proceeded against the thirteenth defendant, Mead Corporation, in a jury trial. The jury found that Mead had conspired to fix prices in the corrugated container industry with eighteen of the settling defendants.

## II

*Arguments that the District Court Abused Its Discretion in Approving These Settlements*

Rule 23(e) of the Rules of Civil Procedure requires that a settlement or compromise of a class action be approved by the district court. The district court below, in its 31st pretrial order, found the twenty-four settlements involved in this appeal to be fair, reasonable and adequate and, therefore, approved them. Two groups of plaintiffs, one comprised of certain members of the sheet subclass and the other of members of the container purchaser subclass, contend that the district court's findings and its concomitant approval of the settlements were erroneous. We are, accordingly, asked to set aside the court's approval.

The objecting plaintiff groups, between them, advance three reasons why the district court should not have given these settlements its imprimatur. The first two reasons do not relate directly to the terms of the settlement, but rather to the manner in which those terms were negotiated by the class representatives. Specifically, the objecting plaintiffs contend that the settlements should be set aside because they were negotiated by attorneys who (1) attempted to represent both subclasses as a single client, a representation that, because of the inherent conflicts between the subclasses, could not adequately be undertaken; and (2) lacked sufficient data to evaluate the settlement value of their cases against each of the defendants. We hold that neither of these objections provides grounds for reversing the district court's approval.

The dissident plaintiffs' third objection is to the adequacy of the terms of each of these settlements. The plaintiffs argue that on the record before us, we must find that the district court abused its discretion in holding that the settlements were adequate. We are unable to evaluate this contention, however, because the district court's findings and conclusions on adequacy were insufficiently detailed to inform us of why the court acted as it did. Although we are reluctant to delay further ultimate judgment on these settlements, we are, under these circumstances, compelled to remand to the district court for findings of fact sufficient for us to determine whether

its approval of the settlements was a proper exercise of discretion. We will retain jurisdiction of this appeal during the limited remand.

The above-summarized holdings are discussed below.

## A.

### Standard of Review

██ Rule 23(e) provides no standard by which a court is to consider the settlement of a class action; rather, the rule states only that "[a] class action shall not be dismissed or compromised without the approval of the court . . . ." Decisional law, however, provides us with a general measuring rod for considering settlements:

> In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable . . . .

*Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). *See also: Young v. Katz*, 447 F.2d 431 (5th Cir. 1971). Approval of a settlement under this standard is not to be upset unless "the trial court clearly abused its discretion." *Young v. Katz, supra* at 432. Thus, our appellate function respecting the various arguments presented on this appeal is a limited one, especially in light of the strong judicial policy favoring settlement of disputes. *United States v. City of Miami, Florida*, 614 F.2d 1322, 1344 (5th Cir. 1980).

## B.

### Conflict of Interest

We turn to the dissidents' first argument: that the district court should have disapproved these settlements because they were negotiated by attorneys with conflicts of interest that adversely affected their representation of one or both classes. As might be expected, the two classes have somewhat different views on which class was hurt and how the hurt was inflicted. The sheet plant dissidents argue that the pre-January 5, 1979, settlements, covering both classes, were negotiated by attorneys representing container purchasers only, and that those attorneys subordinated the interest of sheet plants to the interests of their clients. The container purchaser dissidents present a more subtle argument. They believe that the attempt to negotiate the pre-January 5 settlements on behalf of both subclasses, with their allegedly diverging and irreconcilable interests, made it impossible for negotiating counsel to "have represented the interests of both container purchasers and sheet plants adequately in settlement negotiations." Brief of Plaintiff-Appellant Container Purchasers, at 23. Moreover, the dissident container purchasers also challenge the post-January 5 settlements, arguing that the container purchasers' negotiation of a set-aside fund to be allocated among the sheet plants upon their application polluted those settlements with conflicts of interest.[15]

### 1. *Pre-January 5 Settlements*

██ We can assume, for purposes of considering the conflicts argument, that the two subclasses had significantly diverging interests and that an attorney could not adequately represent all these interests throughout the litigation.[16] This does not mean that the settlements are necessarily void, however, because even "irregular settlement negotiations may . . . form the ba-

---

**15.** The sheet plant dissidents do not challenge the post-January 5 settlements on this appeal, but rather do so in related appeals. *See* note 14, supra.

**16.** The district court, however, would dispute this. According to the court,

> The order carving out a separate subclass of sheet plants was entered because there was some suggestion that a conflict could arise between the two groups, and because the

court was not at that time familiar enough with the corrugated industry to be sure that such a conflict would not arise. It now appears clear that although differences may exist between the sheets plants and other corrugated purchasers, there are no inherent conflicts between them.

*In re Corrugated Container Antitrust Litigation*, 1979–1 Trade Reg. Rep. (CCH) ⸿ 62,690 at 77,-882 (S.D.Tex.1979).

sis for a judicially acceptable class action settlement ... if the record clearly indicates that representation of the class *during* the negotiations was adequate and that the settlement itself is fair." *In Re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1131–32 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) (emphasis supplied). The question of fairness of the settlement terms is considered in a separate section of this opinion. We consider, in this section, the question of adequacy of representation.

Recognizing that the allegedly differing interests of the two subclasses might have conflicted at some point in the litigation, we think the question before the district court was whether these interests conflicted at the point of settlement negotiation, and thus deprived either class of the vigorous and unqualified advocacy in settlement negotiations to which both were entitled. In deciding whether the settlements resulted from proper advocacy, we must inquire, first, whether the general interests of the subclasses respecting the settlements were the same and amenable to being achieved by unified representation; and, second, whether any specific features of the settlement sacrificed the interests of one class in favor of the interests of the other.

■ The way we have framed our first inquiry indicates our agreement with the district court that "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In Re Corrugated Container Antitrust Litigation*, 1980–1 Trade Reg. Rep. (CCH) ¶ 63,163 at 77,788 n.10 (S.D.Tex. 1979). We think it clear that the primary

settlement goal of each class was to cause defendants to agree to pay substantial compensation in exchange for the most limited possible release from their obligations and potential liabilities as parties to the litigation.

We have carefully reviewed the objectors' appellate briefs, and their submissions to the district court in opposition to the settlements, and have not been pointed to anything suggesting that other significant subclasses' settlement interests existed.[17] Neither has there been a suggestion that two sets of negotiators leading to two sets of settlements might have better achieved the common aims of the two subclasses. On the contrary, in these circumstances, logic dictates that one set of negotiators, with the authority to release defendants from *all* claims, would be in a better bargaining position than negotiators with authority to compromise only part of the action.

■ We next consider whether the negotiators, despite the uniformity of the two subclasses' settlement interests, somehow sacrificed, advertently or inadvertently, the interests of one subclass for those of the other. While objectors from each class argue that the dollar values of the settlements were inadequate, neither class suggests that this inadequacy resulted from a tradeoff of its rights in order to realize the interests of the other class. In fact, the only suggested illustration of potential class conflict evolving into actual prejudice concerns the settlement with St. Regis. The sheet-class objectors contend that this settlement should have been larger because St. Regis, while a small container manufacturer, is the nation's third largest manufacturer of corrugated sheets.[18]

---

**17.** The district court noted that the only benefit the sheet plants separate representation achieved was injunctive relief.

**18.** The sheet plant objectors also allege that the settlement with International Paper illustrates the sacrifice of their interests for those of the container-purchaser subclass. The objectors, however, do not suggest that International Paper was a larger manufacturer of sheets than containers; neither do they offer another explanation of how this particular settlement subordinated their interests to those of the container purchaser subclass. We are therefore unable to perceive a basis for the sheet plant objectors' allegation that the International Paper settlement reflects the container purchaser representatives trading against the sheet plants' rights.

To understand the problem the sheet plant objectors perceive, we must turn to the negotiating history of the settlements. The attorneys who negotiated the settlements believed a favorable psychological climate would be created by offering discounts to early settlors.[19] The earliest settlor was St. Regis, which settled for $428,000 per market point, the market points representing combined sheet and container sales. This was at less than one tenth the rate of the last of the settlements being considered in this appeal. The question here, then, is whether the negotiation of an early and substantially discounted settlement with a defendant whose market share is significant with respect only to sheets is prejudicial to the sheet subclass.

On reflection, we think that it is not. In the first place, the settlement with St. Regis was only the first settlement in the steering committee's strategy of demanding successively higher payments for each settlement. There is no suggestion that the steering committee consciously embarked on a course of negotiating discounted settlements with defendants only if their market shares were disproportionately large with respect to sheets. Neither is there any suggestion that the steering committee attempted to negotiate early, heavily discounted settlements for both subclasses, but confined the benefits of later, more valuable settlements to the container class. Since the sheet subclass is to share in both early and later settlements on the same basis—percentage of all sheet sales to all corrugated sales by all defendants—we do not see how this was inherently unfair to the sheet subclass.

Moreover, at the time these settlements were negotiated, members of both subclasses, objectors and proponents alike, believed that all defendants were jointly and severally liable, *see e. g., Beltz Travel Service, Inc. v. International Air Transport Association,* 620 F.2d 1360, 1367 (9th Cir. 1980); *State of Washington v. American Pipe &*

*Construction Co.,* 280 F.Supp. 802, 804 (S.D. Cal.), *cert. denied,* 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968), and that nonsettling defendants, if ultimately found to be liable at trial, would be responsible for the total galaxy of damages caused by *all* participants in the conspiracy. The only expected reduction in damages would have been for the actual amounts paid in settlement. See Brief of Class Plaintiffs-Appellees, at 21. This being the expectation, it is difficult to understand how the St. Regis settlement adversely affected the interests of the sheet subclass, since even a defendant with a small sheet market share would be liable for all damages. But even assuming a theory of liability under which nonsettling defendants were liable only for their own market shares,[20] the sheet plant subclass would be harmed vis-a-vis the container subclass only if the settling defendants' collective share of the sheet market was larger than their collective share of the container market. By isolating the St. Regis settlement for attack, the dissident sheet plaintiffs seek to ignore this fact.

In short, we hold for the reasons stated that conflicts of interest have not infected the settlement proceedings leading to the pre-January 5 settlements.

### 2. *Post-January 5 Settlements*

On December 26, 1978, the district court certified the sheet plant subclass. On the same date, and in apparent reaction to the subclass certification, both subclasses declared a moratorium on further negotiations. The container class resumed settlement talks on January 5, 1979; the sheet subclass did not, apparently deciding to seek further economic data first. This divergence in strategies produced a problem for the container class, since defendants were reluctant to settle at substantial dollar amounts for a release covering only one of the subclasses. To induce defendants to consider settlement on this basis, the con-

---

**19.** This practice is considered in part D of this section.

**20.** Mead Corporation apparently planned to make this argument at its trial. *In Re Corrugated Container Litigation,* [1980–1] Trade Reg. Rep (CCH) ¶ 63,163 at 77,790.

tainer purchasers developed a novel approach. A portion of each settlement would be set aside for the sheet plant subclass, but only in the event the sheet plants applied to participate in these particular settlements. If the sheet plants decided not to participate, the entire amount paid by each settling defendant would inure to the exclusive benefit of the container purchasers.[21] Moreover, the amount of the set-aside fund was to be a cap on the sheet plant subclass recovery; the sheet plants were to negotiate the actual dollar amount with the representatives of the container purchasers.

In all, eleven settlements were negotiated on this basis. The amount paid by each of these settling defendants was in excess of that paid by defendants who had earlier settled. The container-purchaser subclass contends that the set-aside fund strategem engaged the plaintiff representatives in conflicts that destroyed their ability to negotiate fairly. The sheet plant objectors' argument concerning these settlements is the subject of another appeal;[22] on this appeal, only the container purchaser subclass arguments are before us.

The container class contends that the set-aside fund "is a unilateral unbargained for giveaway of monies properly belonging to container purchasers, and [therefore] further evidence of a conflict of interests and lack of adequate representation in settlement negotiations." See Brief of Plaintiff-Appellant Container Purchasers at 30. The logic of this position eludes us. By the time of these settlements, the container purchasers were grouped into a separate subclass and the negotiators after January 5 were negotiating for the container purchaser subclass only. When faced with the unwillingness of defendants to pay large sums of money to obtain a release from only one of the subclasses, the container purchasers agreed to earmark part of each settlement for *possible* allocation to the sheet plants. The position that defendants would have been willing to pay to the container purchasers an amount in excess of the total settlement less the set-aside fund, with no hope of binding the sheet plant subclass, is untenable; it is bereft of logical or factual support.

While it is true that the container-purchaser representatives could have waited until the sheet-plant subclass was ready to participate in negotiations, this would have meant delaying negotiations until after the criminal trial was underway or, more likely, until it had concluded. The container purchasers believed that the eve of trial was an opportune time to bargain, and the only way to bring defendants to the bargaining table appeared to be to offer to create the set-aside fund. Since the container-purchaser objectors do not challenge the wisdom of bargaining on the eve of trial, we see no argument that the decision to negotiate the set-aside fund damaged the container purchasers.

■ We point out that in finding that the container-purchasers' negotiators adequately represented the container-purchaser interests, we do not pass judgment on the sheet-plant dissidents' objections to the post-January 5 settlements.[23]

---

**21.** There is a suggestion that one defendant had an agreement with the container purchasers that if the sheet plants elected not to participate in the settlement, the set-aside fund could be used toward any settlement with, or to satisfy any judgment in favor of, the sheet plant subclass.

**22.** See nn. 14 & 15, *supra.*

**23.** A final note concerning the conflicts of interest argument: The objectors had, two weeks before the preliminary hearing, requested an opportunity to take discovery relating to the manner in which the parties negotiated the settlements. The district court denied these requests because the discovery was not necessary and the request for it was not timely filed. Pretrial Order # 13, Record, vol. 6, at 1068. We are unable to tell from the brief of the objectors whether the district court's refusal to permit discovery is an issue on appeal. Neither the sheet plants nor the container purchaser dissidents identify it in their briefs as such an issue. Given our holding that joint sheet plant-container purchaser representation in the settlement-negotiation stage of this litigation did not create a conflict of interest, and since the objectors have never suggested that discovery was necessary to uncover instances of specific wrongdoing (aside from the general

## C.

### Lack of Discovery

The dissident sheet plant plaintiffs next contend that the settlements should be disapproved because they were negotiated prior to probing discovery. Plaintiffs' theory appears to be that representation in the settlement process is necessarily inadequate unless informed by the process of discovery. It is, in effect, argued that without discovery, the class representatives were not in a position of equality with negotiators for the defendants. From this we are asked to conclude that settlements resulting from this putative inequality of knowledge must be, as a matter of law, inadequate. We disagree.

Initially, we note that notwithstanding the status of discovery, plaintiffs' negotiators had access to a plethora of information regarding the facts of their case.[24] In *Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977), a case in which settlement was reached despite only slight formal discovery, we said the following:

> It is true that very little *formal* discovery was conducted and that there is no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted.

> At the outset, we consider this an appropriate occasion to express our concern over the common belief held by many litigators that a great amount of formal discovery must be conducted in every case.

Thus, we are not compelled to hold that formal discovery was a necessary ticket to the bargaining table. Because the plaintiffs did have access to information, this case cannot be characterized as an instance of the unscrupulous leading the blind.

Even assuming there was an imbalance of information between the defendants and the plaintiffs at the bargaining table, this would not in itself invalidate the settlements. We think in a case such as this, the trial court may legitimately presume that counsel's judgment "that they had achieved the desired quantum of information necessary to achieve a settlement," *id.* at 1332, is reliable. Of course, if the record points unmistakably toward the conclusion that the settlement was the product of uneducated guesswork, a court *may* be acting within its discretion in disapproving the agreement without ever considering whether the agreement's terms are adequate. But since counsel had access to data, that is not our case.

In general, we think a settlement should stand or fall on the adequacy of its terms. In a very real sense, a review of the terms provides a check on counsel's evaluation of the sufficiency of his working knowledge. If the terms are fair, the court may reasonably conclude that counsel did perform adequately.[25] We stress that this is not to say that a district court may approve a settlement whose adequacy is insufficiently documented at the settlement approval hearing. In fact, where it appears that counsel was relying on judgment bolstered by only a small amount of information, the district court should be especially thorough in its review of the fairness and adequacy of the settlement terms.

## D.

### Adequacy of the Settlement Terms

The first two objections to the settlements were attacks on the adequacy of the lawyers who negotiated the settlement terms. As a matter of theory, these attacks presupposed that a settlement negotiated by inadequate representatives should not be

conflicts allegation), the discovery requests were irrelevant, and the court was acting within its discretion in denying them. See *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1218 n.76 (5th Cir. 1978), *cert. denied* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

**24.** See note 10, *supra*.

**25.** We hasten to add that the adequacy of settlement terms cannot ordinarily redeem a settlement that was bargained by a party who *was* in a conflict position. *See, e. g., Clark v. Lomas & Nettleton Financial Corp.*, 625 F.2d 49 (5th Cir. 1980).

approved because adequate representatives could have negotiated more favorable terms. The objectors' third contention, however, is that the actual terms of all but the "hardship" settlements [26] are so inadequate in dollar amount that the district court abused its discretion in approving them. Having disposed of the objectors' first two arguments, we turn to a discussion of whether the settlement terms are fair, adequate and reasonable.

■ As we have suggested earlier in this opinion, the district court's most important function in reviewing compromises of class actions is its consideration of the settlement terms. See *Cotton v. Hinton*, 559 F.2d at 1330. It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting. If the terms themselves are fair, reasonable and adequate, the district court may fairly assume that they were negotiated by competent and adequate counsel; in such cases, whether another team of negotiators might have accomplished a better settlement is a matter equally comprised of conjecture and irrelevance. But all this, of course, begs the real question, which is how to determine whether the settlement terms are in fact adequate.

■ Case law provides us with general ground rules: "The settlement terms should be compared with the likely rewards the class would have received following a successful trial." *Cotton v. Hinton*, 559 F.2d at 1330. And: "the strength of the case for plaintiffs [must be] balanced against the amount offered in settlement." *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.) (quoting *State of West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed. 115 (1971). *See also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974). We think this requires a three-step process. First, the district court must evaluate the likeli-

hood that plaintiffs would prevail at trial. Second, the district court must establish a range of possible recovery that plaintiffs would realize if they prevailed at trial. And third, guided by its findings on plaintiffs' likelihood of prevailing on the merits and such other factors as may be relevant, the district court must establish, in effect, the point on, or if appropriate, below, the range of possible recovery at which a settlement is fair and adequate.

■ We note that this type of evaluation is not and cannot involve a trial on the merits. "[T]he very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). Nor could it be achieved if the range of possible recovery had to be charted with precision. But the district court judge must "undertake an analysis of the facts and the law relevant to the proposed compromise," and he must "support his conclusions by memorandum." *Cotton v. Hinton*, 559 F.2d at 1330. "A 'mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law' will not suffice." *Id.* (quoting *Protective Committee v. Anderson*, 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968). This is because "[a]n appellate court ... must have a basis for judging the exercise of the trial judge's discretion." *Id.*

Thus, we begin our analysis by reviewing the district court's opinion to determine whether its approval of the settlements was based on adequate and careful analysis of "the facts of the case in relation to the relevant principles of applicable law..." *Id.* at 1331. Because we conclude that it was not, we must also determine whether,

---

**26.** The objectors have not challenged the two "hardship" settlements for adequacy. They do, however, object to the formula by which these settlements are to be divided between the two classes. This is discussed in section III, *infra*.

on the record before it, the district court, in the exercise of its discretion, was *compelled* to either approve or disapprove the settlements. After undertaking this review, we conclude that we must remand to the district court to prepare new findings; if necessary, to take new evidence; and if compelled to do so, to reach new conclusions.[27]

 We turn to the specific reasons for our decision. As we have already indicated, the district court must establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors. In a case such as this, where there are objectors, the court is aided in its task; the proponents can be expected to present evidence and arguments suggesting that the settlements are within "a range of reasonableness" and the objectors will do the same for the contrary position. By weighing the competing evidence and evaluating the legal arguments, we think the court should be able to reach a just conclusion. It is for this reason that the court can generally fulfill its responsibilities by "examin[ing] the settlement[s] in light of the objections raised and [by] set[ting] forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response." *Cotton v. Hinton*, 559 F.2d at 1331.

We will consider, then, each of the objectors' attacks on the settlement, and the court's resolution of them. Our initial discussion is broken down into three parts: one on the range of possible recovery, one on the likelihood of prevailing on the merits, and one on the court's exercise of discretion. We then proceed to explain why we think remand is necessary and what we think the court's task on remand is.

### 1. *Damages*

The plaintiff proponents of the settlement presented the affidavit of an economist, Richard Hoyt, that estimated that damages to the plaintiff class were between two hundred and eight hundred million dollars for the years 1972–1976, the four-year period not barred by the statute of limitations. It seems clear that the court regarded this range of damages as the benchmark of possible recovery at trial.[28]

At the settlement hearing, and on this appeal, the objectors attacked Hoyt's conclusions on two grounds. First, the sheet plant objectors contended that the period he selected to estimate damages should have been enlarged to reflect the entire period of overcharge since plaintiffs might have been able to establish that the defendants engaged in a pattern of fraudulent concealment, which would have tolled the statute of limitations. *See In Re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1169 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *Westinghouse Electric Corp. v. Burlington*, 351 F.2d 762, 764 (D.C. Cir. 1965); *Rinzler v. Westinghouse Electric Corp.*, 333 F.2d 719 (5th Cir. 1964). Second, objectors from both the sheet-plant and container-purchaser subclasses, through affidavits of *their* economists, argued that Hoyt's methodology was defective and resulted in an esti-

---

**27.** As is discussed in subsection D.4, *infra*, we are, at this juncture, remanding the case to the district court to allow it to explain in more detail the reasons it approved the settlements. If the court is unable to prepare such findings, we will vacate the order to allow the court to consider the issue anew with new evidentiary hearings and with the ability to reach different conclusions.

**28.** The settlement proponents would dispute this. In their briefs, the proponents point to footnote 15, appearing in the district court's memorandum approving the settlements, which purports to find that if plaintiffs prevail at trial, "actual damages, if any are found, will be somewhere between [the proponents' lowest estimate ($700,000,000) and the objectors' highest estimate ($1.6 billion) of the damages for the four-year period]." *In Re Corrugated Container Antitrust Litigation*, [1980–1] Trade Reg.Rep. (CCH) ¶ 63,163 at 77,790 n.15. We cannot accept this recital of the self-evident as a finding of fact supporting approval of the settlements or somehow excusing the court from considering the validity of the competing estimates.

mate of damages that was far too low. The objectors urged the district court to accept their own estimates, which were substantially greater than Hoyt's, as providing an accurate range of possible recovery.

We consider first the argument that the court should have considered damages suffered in years prior to 1973. The proponents of the settlements argue that some courts have looked only to years within the statute of limitations to determine whether a settlement is reasonable. *See, e. g., Detroit v. Grinnell Corp.*, 495 F.2d 448, 460 (2d Cir. 1974); *In re Anthracite Coal Antitrust Litigation*, 79 F.R.D. 707, 714 (M.D.Pa. 1978), *modified sub nom. Colonial Fuel Co. v. Blue Coal Corp.*, 612 F.2d 571 (3d Cir. 1979). The objectors, however, counter that these courts were not confronted with strong arguments that the statute of limitations was tolled by defendants' fraudulent conduct. They argue that in the case before us, evidence of fraudulent concealment does exist, which means that damages should be measured from 1960, the beginning of the conspiracy.

■ The sheet-plant objectors are correct that the law does not limit the court to the four-year period within the statute of limitations in setting the range of possible damages recoverable after trial. The *Grinnell* case, relied upon by the proponents, explains that consideration of possibly time-barred years was inappropriate there because fraudulent concealment would not, on the facts alleged, extend the period for claims. *Id.*, 495 F.2d at 461. Further, we have not been referred to any case suggesting that damages should, for settlement discussions, be confined to the statutory period in the face of a strong fraudulent concealment argument. We think that when objectors seek to include years outside the statute of limitations in the damage computation period, the court should evalu-

ate the fraudulent concealment argument. It should also consider the extra problems of proving a price-fixing conspiracy for the longer period and the additional difficulties of proof in assessing damages. If the court finds the chances of substantial recovery for the added years to be insignificant, it may confine its consideration of damages to the non-time-barred years. If the district court concludes that the plaintiffs have a significant chance to recover substantial amounts for years outside the statute of limitations, it should refuse to approve a settlement until it is given some estimate of damages for that period, or at least an acceptable explanation why the estimate for the period within the statute of limitations is a fair measure of damages for both periods.[29]

Here the district court failed to explain why it only considered damages for the years within the statute of limitations. Its decision on this matter is an essential element of its overall decision to approve these settlements, but since the court has not provided us the benefit of its thinking, we are unable to review it.

■ The objectors' second concern is with the methodology Hoyt employed in estimating damages. The objectors argue that the best means of estimating damages in a price-fixing conspiracy is a before-and-after price comparison. Hoyt rejected this method, however, for several reasons, among them (1) that he would have to rely on industry-wide prices, which he perceived as undesirable because the conspirators comprised only part of the industry; (2) he believed that price information for the period before 1973 would be unavailable. In the place of the before-and-after price comparison, Hoyt believed a methodology based on excess profits. Using this approach, he computed the percentage of defendants' sales receipts that constituted profit for the

29. A troubling point is that apportionment of the settlement fund is to be based on the ratio of each class member's purchase dollars between 1960 and 1976 to the total dollar amount of claims submitted. This means, of course, that claims based outside the statutory period will be treated as equal in value to claims within the period. But if the district court finds the former claims to have only marginal settlement value, they should be worth less when the settlement funds are distributed than the latter claims. This problem is considered in section III, *infra*, which discusses allocation of the settlement proceeds.

conspiracy period (1972–1976) and a non-conspiracy period (1977–1978) and then compared the two figures. Hoyt believed that the amount by which the profits for the conspiracy years exceeded the profits for non-conspiracy years constituted an excess profit percentage. This figure, when applied to total sales, closely approximated the actual damages suffered.

The objectors believe this methodology is defective for several reasons, primarily the following two: (1) profits are affected by external facts that vary in impact from year to year; (2) costs during the conspiracy period would be higher since industries engaged in price-fixing are less cost-efficient than they would be during a non-conspiratorial period. The dissident plaintiffs also object to the years compared in Hoyt's model, claiming that the conspiratorial period—1973–1976—was a recessionary period in which profits were low, while the non-conspiratory period—1977–1978—was a period of economic expansion, in which profits were high. They also object that Hoyt's profit figures were derived from industry sources, without any significant check on their accuracy. The sheet objectors claim that Hoyt made no attempt to determine if their damages should be measured separately from those of the container purchasers. Finally, both sets of objectors take issue with proponents' assertion that the task of preparing a more traditional model based on prices rather than profits could not have been successfully undertaken.

The district court does not discuss these criticisms of the Hoyt study, nor does it explain why it found the Hoyt conclusions more accurate than those of the objectors' experts, who pegged damages at substantially higher levels. In fact, the court's only comment on the economic validity of the Hoyt analysis suggests that it perceived no challenge to the validity, or at least the utility, of the analysis.

Although there have been some assertions that damages are greater than proponents' expert estimates, no one has asserted that more money could have been or could now be obtained from the defendants....

*In re Corrugated Container Litigation,* [1980–1] Trade Reg.Rep. (CCH) ¶ 63,163 at 77,788 n. 10. Objectors' challenges to the Hoyt analysis are implicitly tied to their belief that they could have negotiated better settlement terms. Even if the court is correct, however, that more money could not have been obtained, there is no reason to approve an otherwise inadequate settlement solely because it was the best offer defendants were willing to make.

Given the importance of the question of potential damages, the district court was compelled to consider the validity of the estimate on which it relied. If the court did find the estimate to be valid, it was bound to explain why. Thus, we must remand on this issue as well.[30]

Finally, we note that the district court, in passing on these settlements, considered them, for the most part, as a single settlement rather than as twenty-four separate agreements. The propriety of doing this is considered in the subsection on the court's exercise of discretion, but two observations concerning damages are appropriate here. First, because each defendant's liability, if any, would be joint and several, his potential liability is the total amount of damages, less any amounts already paid to the plaintiff class. This means, theoretically, that the plaintiffs could obtain the same amount from each defendant. Accordingly, a single computation of a range of possible recovery suffices for each defendant. The second observation, however, is that in determining

---

**30.** We are ultimately required to vacate the settlement approval order, the district court may wish to engage the services of a court-appointed expert to review the soundness of Hoyt's methodology. The Manual For Complex Litigation, section 1.46 recommends use of a special master in evaluating a settlement in particularly complicated cases. 1 Moore's Federal Practice §§ 1.46, 3.40 (2d ed. 1980). We endorse this recommendation. We must question whether the district judge or this panel has sufficient acumen in the field of economics to consider, unaided by objective independent expertise, the economic issues involved in this case.

the amount of damages *actually*, rather than theoretically, recoverable from a particular defendant, the question of that defendant's financial condition *may* become relevant. Except in the case of the hardship settlements, the district court has not made findings about the extent to which these defendants could afford to pay more than they did. We consider this point, too, in the subsection on the court's exercise of discretion.

### 2. *Risks of Litigation*

The objectors claim that the court incorrectly evaluated the strength of their case on the merits, overemphasizing the risks of litigation. The district court stated its findings and conclusions on the risks of litigation in its preliminary approval of the settlement:

> There are many risks for plaintiffs in this litigation; the recent acquittal of all who went to trial in the cases brought by the United States serve [sic] to emphasize some of the problems, and there are others that apply peculiarly to those civil cases, such as class certification problems and the proposed *Illinois Brick* legislation. Plaintiffs' ultimate success is by no means assured.

*In re Corrugated Container Antitrust Litigation*, [1979–1] Trade Reg.Rep. (CCH) ¶ 62,690 at 77,884.

The objectors contest the court's evaluation of litigation risks for three reasons. First, they claim that the court should not have relied on the criminal acquittals, since the standard of proof in the criminal trials was greater than it would be in the civil litigation. Second, they argue that the court's findings were insufficiently detailed, and conclusory, amounting to mere boilerplate. Third, they claim that the court failed to explain its conclusion that the risks of litigation justified a settlement at the $300-million mark on Hoyt's $200-to-800 million range of possibilities.[31]

■ Turning to the first objection, the dissident plaintiffs argue that "a criminal acquittal has absolutely no tendency to make any contested fact in a subsequent civil proceeding more or less probable," and that "giving 'considerable weight' to the criminal acquittals ... resulted in a distortion of the settlement equation." Brief for Plaintiff-Appellant Container Purchasers at 58–59. If the objectors are contending that the district court should not have considered the acquittals at all, they are in conflict with the Manual For Complex Litigation, section 1.46, which states that the court should consider success or lack of success in a prior criminal prosecution. 1 *Moore's Federal Practice* § 1.46 n. 100 (2d ed. 1980). The Manual's position is sensible. A court may more safely predict that a civil litigant will prevail on the merits if there has been a successful criminal prosecution in a related matter than it could had there been no criminal trial, or, certainly, had there been an acquittal. This being so, a case in which defendants were acquitted has less settlement value than one in which convictions were obtained. Here the court drew from the acquittal only a single inference: "ultimate success is by no means assured." *In re Corrugated Container Antitrust Litigation*, [1979–1] Trade Reg.Rep. (CCH) ¶ 62,690 at 77,884. This was entirely proper.

■ The objectors' second contention is that the court failed to evaluate the strength of plaintiffs' case on the merits. This simply is not true; as the quotation from the court's preliminary approval suggests, the court noted that the risks of class decertification, of *Illinois Brick* legislation, and the problems of proof suggested by the criminal acquittals combined to deprive the class of guaranteed ultimate success. In noting this, the district court said enough, though it certainly could and probably should have said considerably more. We hope that on the limited remand we order

---

**31.** This last objection relates to our evaluation of the court's reasoning in reviewing its exercise of discretion, *i. e.*, its determination that the probability of success and the range of possible recovery in the event of success justify settlement at a particular level. See subsection III D., *infra*.

today, the district court will explain more completely how it evaluated the strength of plaintiffs' case on the merits. Particularly, the district court may wish to cite those portions of the record below, and, if applicable, the record of the related criminal proceedings, on which it relied.[32]

One final point must be made. The district court concluded that plaintiffs' ultimate victory on the merits is not assured. This conclusion, however, applies to the plaintiffs' case against all the defendants collectively rather than individually. In all probability, the plaintiffs' case is stronger against some defendants than others. Because the district court treated the settlements in the aggregate, it had no occasion to consider the strength of plaintiffs' case against individual defendants. As we explain in the next section, it may have been necessary for the court to consider, to some extent, the strength of plaintiffs' cases against individual settling defendants.[33]

### 3. Exercise of Discretion

We have outlined a three-step process for a district court to use in determining whether it should approve a settlement's terms as fair, reasonable and adequate. In the first two steps, which we have described above, the court must decide two key issues: the range of possible recovery if plaintiffs prevail on the merits and the likelihood that plaintiffs will, in fact, prevail. In the third step of the process, the court, in its discretion, must decide if the settlements are reasonable in light of these determinations. In doing this, the court is not confined to the mechanistic process of comparing the settlement to the estimated recovery times a multiplier derived from the likelihood of prevailing on the merits. The court should

also be guided by other factors, the relevancy of which will vary from case to case. Some of the factors that may be relevant in a particular case are "the complexity, expense and likely duration of the litigation . . .; the reaction of the class to the settlement; [and] the stage of the proceedings . . . ." *City of Detroit v. Grinnell Corp.*, 495 F.2d at 463 (2d Cir. 1974). After the court identifies these factors and explains their relevance to the settlement, it should proceed to explain why it is either approving or disapproving the settlement.

Here, the district court, in addition to its findings concerning damages and the likelihood of success, identified two factors that it felt bore on the reasonableness of the settlements. The first factor was that the trial would be long, complex and expensive. The court, however, offered little to indicate how this affected the reasonableness of the settlement. While the prospect of a long, complex and expensive trial militates in favor of settlement, virtually all class actions will result in long, complex and expensive trials. The question is whether the likelihood of an especially long and complex trial is enough in a particular case to warrant a substantial reduction in what the class might otherwise receive in settlement.[34] The district court, however, said nothing to indicate why the prospect of a long trial had a particular impact on this case.

The district court also found that the number of objectors to the settlement and the number of opt-outs was insignificant; from this it concluded that there was great support for the settlements, which is certainly a factor favoring approval. But further explanation was required, for a low

---

**32.** Proponents of the settlements have suggested that the district court's familiarity with the records in this case and with the criminal trial are adequate support for the court's approval of the settlements. While the district court's relationship with these cases may have provided it with knowledge about the strength of plaintiffs' civil action, we nonetheless are unable to review the approval without specific findings, supported by information in the record presented to us.

**33.** The plaintiff class negotiators did consider the relative strength; they generally demanded higher settlements from indicted defendants than from defendants in the unindicted group.

**34.** It must be remembered that the settling defendant is also spared the expense of trying the case.

level of vociferous objection is not necessarily synonymous with jubilant support. In many class actions, the vast majority of class members lack the resources either to object to the settlement or to opt out of the class and litigate their individual cases. The Corrugated Container Litigation, however, includes many large corporations who were sufficiently endowed to opt out or object to the settlements if they chose to do so. If the numerically small group of objectors was comprised largely of such corporations, perhaps the court's finding of support was improperly predicated. Based on what the court has told us, however, we cannot say.

 Thus, we must conclude that the court's findings on factors other than possible recovery and the likelihood of success were not detailed enough for us to review. In its conclusion, rather than explain why it approved the settlements, the court only recited a list of the findings it had made concerning the settlements.[35] While an overall list of findings may be sufficient for review when a court has made detailed and careful explanations as it conducted its consideration of each factor affecting its exercise of discretion, this was not the case here.

 One last point must be made. As we indicated earlier, the district court appears to have approved these settlements in the aggregate. Ordinarily, an individually negotiated settlement with one of many defendants in a case should be approved or disapproved as an individual settlement and not as part of a package. The package of settlements the district court approved includes early settlements negotiated at a fraction of the value of later settlements. Settlements early and late may both be reasonable, particularly if the district court finds, as it did, that early settlements were

needed to induce other defendants to the bargaining table. But this does not excuse a settlement at an inadequate amount. The district court should have made some findings concerning why each individual settlement was reasonable, or at least explained why it was unnecessary to do so.

#### 4. Task on Remand

 Because the district judge has failed to support his approval of the settlements by adequate evaluation of the facts and analysis of the law, we lack a basis for reviewing his discretion. *Cotton v. Hinton,* 559 F.2d at 1330. Thus, were we at this juncture to affirm the approval of the settlements, we would not be reviewing the district court's exercise of discretion but, rather, exercising our own discretion on the basis of the record before us. This is not our function, and we therefore must remand to the district court.

The remand is a limited one to allow the court better to explain why it approved the settlements. If the district court, after reviewing this opinion, believes its previous approval of the settlements cannot be justified under the applicable legal principles, it may petition this court to vacate its order approving the settlements and to remand the case for further proceedings on the settlements, and, if necessary, the merits of plaintiffs' claims.

### III

#### *Allocation of the Settlements*

The sheet-plant and container-purchaser objectors contend that even if the settlements are fair, reasonable and adequate, the formula by which the pre-January 5, 1979, and the "hardship" settlements are to be distributed is not. The formula is a

---

**35.** In *In Re Corrugated Container Antitrust Litigation,* 1980–1 Trade Reg.Rep. (CCH) ¶ 63,163 at 77,791, the court stated:

The settlements offer many benefits to the class. They provide a very substantial recovery without giving up any claimed damages that may ultimately be proved. They provide for valuable discovery assistance, and they ensure against the many uncertainties of con-

tinuing litigation. They were negotiated before the evidence was presented and the defendants acquitted in the trial of those indicted; it would be a long, hard and expensive task to achieve equal concessions should the court disapprove these settlements and send the parties back to their negotiations. The law favors settlements, and certainly it should favor these.

simple one: each class member will file a claim based on its purchases between 1960 and 1978 and "all allowed claims will be totalled and the sum divided into the total [settlement] fund (after deduction of fees and costs), and the quotient will be multiplied by each claimant's total allowed claim to determine his recovery." *In re Corrugated Container Litigation*, [1980–1] Trade Reg.Rep. (CCH) ¶ 63,163 at 77,791. There are, before us, two specific objections to this formula. First, the sheet-plant and container purchasers argue that neither the court nor the subclass representatives had any economic data to justify equal, dollar-for-dollar treatment of container purchases and corrugated sheet purchases.[36] Second, the sheet-plant objectors contend that claims based on purchases before 1973—the cut-off point under the statute of limitations—should not have been treated on par with claims based on post-1972 purchases. We review each of these contentions below.

1. Allocation Between the Sheet Plant and Container Purchaser Subclasses.

The container and sheet-plant subclasses negotiated between themselves the inter-class allocation formula which treats sheet and container purchases in the same fashion. The settlement proponents represented that they reached the inter-class formula because "[b]oth sides recognized that there was no information available that conclusively demonstrated that the subclasses were injured in different degrees." Brief of Class Plaintiffs-Appellees at 54. Since "[t]here was evidence which indicated that the conspiracy was operative as to both sheets and containers and that both were affected by the conspiracy," *id.* at 54–55, the negotiators agreed that the "share-and-share-alike" allocation plan was fair. The district court accepted the allocation formula, but did not explain why it found it

reasonable to treat container and sheet purchases in the same manner.

The objectors claim that it was error for the proponents to negotiate this allocation solution without benefit of an economic analysis of the comparative injuries suffered by each subclass and that it was reversible error for the district court to approve the allocation formula without the benefit of such an analysis. We disagree with the objectors to this extent: when there are subclasses, each independently represented, an allocation formula may be negotiated without each subclass undertaking extensive analysis of its relative damages *if* the available evidence is, at the time of the negotiations, insufficient to indicate a need for it.

Other courts have approved the practice of negotiating a formula for distributing settlement proceeds to subclasses. *In re Equity Funding Corp. of America Securities Litigation*, 603 F.2d 1353, 1365 (9th Cir. 1979); *In re Gypsum Cases*, 386 F.Supp. 959, 964–5 (N.D.Cal.1974) *aff'd*, 565 F.2d 1123 (9th Cir. 1977). This practice permits the court to avoid "the almost impossible task of determining the distribution of the settlement fund among the myriad claimants," *Equity Funding Corp.*, 603 F.2d at 1365, and can be desirable if the respective subclass representatives have information sufficient to allow them to formulate a reasonable division.

Although the district court did not make findings on this issue, the record establishes that the subclass representatives in this case acted properly in reaching the allocation formula before completing extensive discovery. It must be remembered that the representatives needed to describe the allocation formula in the class notice. Assuming, as the district court was justified

---

**36.** The objectors, of course, have differing views on which subclass would benefit from the revised formula. Container purchasers contend that "Proponents' allocation plan unjustly enriched sheet plants at the expense of container purchasers." Reply Brief for Plaintiff-Appellant Container Purchasers at 21. But sheet plants contend that "Whereas for each

expenditure of $110.00 a *Container Purchaser* sustained damage in the amount of *$10.00*, for each expenditure of $110.00 a *Sheet Plant* sustained damage in the amount of $15.71." Affidavit of Sam Peltzman, at p. 13, Appendix, Brief of Plaintiffs-Appellants Great Northern Packaging Corporation, *et. al.*

in doing, that it was desirable to present these settlements to the class before lengthy trial preparation began, we cannot say that notice should have been delayed until after discovery was completed and an exhaustive analysis of comparative damages made. At the time of the negotiations, the plaintiffs knew that all damages—sheet and container—resulted from a common conspiracy. The sheet plants apparently possessed documents suggesting that the overcharge for sheets *might* have been less than the overcharge for container. The objectors on this appeal advised their respective classes that they suffered greater damages than the other. Moreover, each class knew the other class was receiving similar counselling about why its damages were greater. Under these circumstances, the plaintiffs acted acceptably in agreeing to the share-and-share-alike distribution formula when they did. Further, the district court acted within its discretion when it approved the formula.[37]

### 2. *Treatment of Pre-1973 Claims.*

The sheet-plant objectors contend that if the adequacy of the settlement was dependent on a district court finding that the claims for pre-1973 purchases had no value, the settlement should have been distributed on the basis of claims relating to post-1972 purchases only. Their theory is that the settlement would otherwise satisfy nonvaluable claims based on pre-1973 purchases with dollars negotiated on the basis of viable claims based on post-1972 purchases. Because the district court failed in its memorandum to explain its findings on the adequacy of the settlement, we are unable to say whether it found the pre-1973 claims to be without value or of substantially less value than the post-1972 claims. If approv-

al of the settlement was based on either proposition, the objectors may have a valid point.

■ It is self-evident that if the settlement's adequacy rests on the value of one set of claims, distribution of the settlement should be weighed heavily in favor of plaintiffs whose claims comprise that set. There might be circumstances in which this rule would not apply—for example, if most of the plaintiffs had claims in both periods and the costs of devising and implementing a distribution formula based on relative claim value would be substantial, the distribution might be spread evenly across the board. The district court, however, has failed to provide persuasive reasons why an even spread is appropriate in this case. The court's sole reply to the objection that the claims period should be shortened was that "[t]o shorten the period would prejudice claimants who purchased for the full period, and a pilot study conducted by Arthur Anderson & Co. indicates that the savings in auditing would not be great enough to justify such a limitation." *In re Corrugated Container Antitrust Litigation,* [1980–1] Trade Reg.Rep. (CCH) ¶ 63,163, at 77,791. This is not responsive to the substantial issues now raised by the sheet-plant objectors.

■ If the district court, on remand, explains that it based its estimate of what plaintiffs would recover on the value of the post-1972 claims alone, and if it fails to provide a reasoned explanation why a substantial portion of this money should be distributed to plaintiffs in satisfaction of their pre-1973 claims, the distribution formula cannot be approved, and that part of the order approving the settlement must be vacated. If this occurs, the district court

---

**37.** Even if the formula were based on unacceptable guesswork, we might, on the facts of this case, affirm the district court's approval of it. If we ultimately vacate the order approving the settlements, the district court may have to consider the impact of the jury verdict rendered in the trial of Mead Corporation in deciding whether to approve the settlements and the allocation formula. The jury found, albeit under instructions to which some container-pur-

chaser plaintiffs took exception, that the overcharges for each subclass were five percent. This means that the ultimate fact-finder, on the basis of the fully developed facts of the case, concluded that each class was overcharged by the same percentage. In the face of this finding, the district court, if it were to consider the issue again, might well be abusing its discretion if it were to disapprove the "share-and-share-alike" inter-class allocation agreement.

might need to carve out additional subclasses to protect the varying plaintiff interests deriving from the periods in which individual class members made their purchases.[38]

## IV

### State-Law Objectors

Pleasure Hours, Inc. and London Dry, Ltd. are members of the container-purchaser subclass. They are also the named plaintiffs in a South Carolina antitrust suit against the same defendants and based on the same operative facts as this federal antitrust action. According to Pleasure Hours and London Dry, South Carolina antitrust law equates damages with purchase price rather than overcharge and hence treats prevailing antitrust plaintiffs more favorably than federal law. Because of this alleged feature of South Carolina law, Pleasure Hours and London Dry are concerned with the provisions of the settlements that purport to release defendants from state as well as federal antitrust claims.

The state law objectors believe that the court should either modify the settlement to eliminate the state-claim releases or declare the releases unenforceable. If this cannot be done, they claim that the court should disapprove the settlements entirely. The

objectors apparently base their position on five arguments, none of which has merit and all of which border on the frivolous.

■ The objectors first argue that because the district court did not have the state law claims before it[39], it was without power to release those claims by approving a settlement. This is simply a misstatement of applicable legal principles, at least in cases such as this one in which class members were notified that their state law claims might be released before they had to decide whether to opt out of the class. The weight of authority establishes that in such a case, a court may release not only those claims alleged in the complaint and before the court, but also claims which "could have been alleged by reason of or in connection with any matter or fact set forth or referred to in" the complaint. *Patterson v. Stovall*, 528 F.2d 108, 110 n.2 (7th Cir. 1976). See also *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d 416, 435 (7th Cir. 1977). And it has been held that even when the court does not have power to adjudicate a claim, it may still "approve release of that claim as a condition of settlement of [an] action [before it]." *Abramson v. Pennwood Investment Corp.*, 392 F.2d 759, 762 (2d Cir. 1968) (shareholder derivative action).[40] Thus, the court had power to

38. Possible subclasses are a class of plaintiffs all of whose claims are based on pre-1973 purchases; a class of plaintiffs all of whose claims are based on post-1972 purchases; and a third class whose claims are based on purchases during both periods.

39. It is undisputed that the federal district court would have had pendent jurisdiction to try the state law claims as a part of the consolidated litigation.

40. The objectors point to the Seventh Circuit decision in *In Re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979), in support of their position. The objectors cite the following statement in the court's opinion: "The trial court, having *declined* jurisdiction over state claims, was without power to extinguish them [in settlement]." 594 F.2d at 1134 (emphasis added). Put into context, this statement does not mean what it might otherwise seem to suggest. In the General Motors case, each class member

had the option to opt out of the settlement, even though they had previously let lapse their right to opt out of the class. Although the Seventh Circuit's opinion indicates that class notice included the information that General Motors and class representatives had negotiated a proposed settlement, 594 F.2d at 1116, the opinion does not indicate whether the notice informed class members that this settlement would release their state law claims, and we are unwilling to assume that it did. Given this, we read the opinion to hold that a court can approve a settlement extinguishing state claims not before it if the class members have been notified that their participation in the class or the settlement might result in release of their state claims. In the case before us, the class notice provided class members with the information that the court had preliminarily approved settlements releasing federal and state claims. Armed with that knowledge, the objectors opted to participate in the class. Thus, the district court's dismissal of the state claims is consistent with our reading of the General Mo-

release the state claims even though those claims were not pending before it.

▮ The objectors next contend that the settlements should be disapproved because the court did not consider whether the release of the claims rendered the settlement unreasonable. The district court's memorandum order finally approving the settlements, however, includes the following statement: "Such releases are reasonable and customary, and without them settlement of large antitrust actions would not be desirable . . . ." *In re Corrugated Container Antitrust Litigation*, [1980–1] Trade Reg.Rep. (CCH) ¶ 63,163 at 77,789. We agree with the district court that releases from state claims are generally reasonable and the objectors have not pointed to any extraordinary factors dictating different treatment of the state-claim releases here.

▮ A third argument seemingly, but inartfully, advanced by objectors is that the release of the state claims is unenforceable because of a state court injunction forbidding the state defendants to settle the state claims as part of a compromise of the federal action. In other words, the objectors are asking us, on appeal, to honor, indirectly, in these settlement proceedings a state court injunction they did not try to enforce directly in any court. Even were we to assume that the objectors could attack a settlement on the basis of an unenforced injunction either in the district court or on appeal, we would be compelled in this case to rule against them. Presumably, their argument is premised on the notion that the state-court injunctive order is a valid one, for certainly the district court cannot be expected to withhold approval of a settlement on the basis of an unenforceable injunction. In the instant case, the record on appeal does not indicate whether the state-law objectors submitted to the district court a copy of the injunction or whether they even requested a hearing to show that the injunction was enforceable. In these cir-

cumstances, the district court had no basis to consider the injunction's relevance to approval of the settlements, and neither do we.

▮ The objectors next contend that the tenth amendment prevents the district court from approving settlements releasing state claims. The following passage from their brief summarizes this argument:

Since the primary forum for enforcement is the State Courts federal courts should be reluctant to enter into [state antitrust law] unless the State Courts agree to this. It is not necessary for [the objectors] to cite the numerous decisions of the Supreme Court of the United States expressing the same principle.

Brief for Plaintiff-Appellants Pleasure Hours, Inc., Etc. [sic] at 20. We disagree. Nothing in the tenth amendment or its accompanying case law mandates in every case judicial reluctance to enter the state antitrust area. The objectors' contention is frivolous.

▮ The objectors' fifth and final objection is that counsel for the class, by negotiating settlements releasing state claims, rendered themselves inadequate representatives of that portion of the class with South Carolina claims. We think this is an implausible argument, at least in the circumstances of this case. Plaintiffs had an opportunity to opt out of the class and litigate their state claims in state court; more pertinent, they knew that settlements compromising class members' state claims had been negotiated before they were asked to opt out. Plaintiffs, however, wanted to participate in the class, share in the fruits of the class' settlement negotiations, and still be free to litigate their state claims. In short, the objectors felt entitled to the bird in the hand while pursuing the flock in the bush. *See Richards Lumber & Supply Co. v. United States Gypsum Co.*, 545 F.2d 18 (7th Cir. 1976), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 593 (1977). If the objectors felt they could do this, that was their

tors case. We thus have no occasion to decide whether we agree with the Seventh Circuit that a federal court can be jurisdictionally barred in

some circumstances from releasing state claims not before it.

prerogative but in so doing they accepted the risk that they would be precluded. At least in a situation like this—in which the objectors had a pending state class action based on the same facts and theories as the federal class action [41]—objectors cannot complain that class counsel was inadequate for making, in effect, release of their state-law claims a condition for participation in the class.

## V

### Notice

The sheet plant and state law objectors argue that the notice apprising the class of the settlements was inadequate. Although the objectors do not specify what they believe the consequences of this inadequacy to be, we assume their position is that new notice must be accomplished, and, following such notice, a *de novo* hearing in the district court on whether the settlements finally should be approved. In all, these objectors advance four arguments why the notice was defective. None of these arguments convinces us that the notice was inadequate.

■ The first argument, advanced by the sheet plants, is that notice of the class action should not have been combined with notice of the settlements. This is because "[t]he practice of presenting class members with the ultimatum either to accept the settlement or get out of the class is contrary to fundamental fairness [and] evades the requirements of 23(c)(2) and 23(e) that there be separate notices, in two stages." This argument is specious. Rule 23 includes no language proscribing combined notice of a class action and a proposed settlement. Since there is no specific proscription, the sheet plant objectors are left only with their contention that the single-notice procedure was unfair. This position is incapable of withstanding analysis.

The sheet plants desire an initial notice of the class action and, then, after potential class members have decided whether to participate in the class, notice that the class representatives have reached settlements with certain defendants. At this point, of course, class members could object to the settlements, but if the district court, despite their objections, approved the settlements, all class members would be bound thereby. It thus seems evident that whether one or two notices are employed, a plaintiff will have three options: (1) he may participate in the class; (2) he may participate in the class, but object to the settlements; or (3) he may opt out of the class. Given this, there is only one difference between the scheme advocated by the sheet plants and that confected by the district court: in the latter scheme, the class member knows of the settlement at the time he must decide whether to opt out. Since we have previously held that "neutral information concerning plaintiffs proposed partial settlement . . . should [be] included in the court's initial notice [to the class under Rule 23(c)(2)]," *In Re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1105 (5th Cir. 1977), the district court's scheme was certainly a permissible exercise of discretion.[42]

■ The remaining arguments relate to whether the notice disclosed sufficient information for individual class members to make informed choices about joining the class and accepting or objecting to the settlement. The first such argument is that the notice failed to provide "an estimated range of unitary recovery (e. g., amount per share, per unit, per dollar charged, and the like) that members of the class may expect to receive if the settlement is approved," as suggested by the Manual for Complex Litigation, section 1.46. 1 *Moore's Federal Practice* § 1.46 (2d ed. 1980). The second

---

41. Objectors resisted consolidation of their state action with the federal class action.

42. The South Carolina objectors claim that another aspect of the notice scheme prejudiced class members: the inclusion of a claims form with the notice. (The class members were asked to list their corrugated purchases on this form.) Completion of the form did not waive any rights to object to the settlement and we fail to see how inclusion of the form with the notice prejudiced any class member in any way.

argument is that the notice should have informed the class that members of the sheet plant subclass objected to the settlements, and should have included a summary of their reasons for doing so. Similarly, the state-law objectors contend that the notice should have included space for them to explain the purported advantages to South Carolina plaintiffs of pursuing their state-law claims.

The sheet-plant arguments point out rather disturbing omissions in the notice. The Manual states that ordinarily a notice should provide estimates of unit recovery. Class members in this case might have benefitted from the knowledge that some *class representatives* thought the settlements were inadequate. Our review of the notice, however, is confined to a determination of whether the district court abused its discretion in approving the notice, and it is not clear that it did. The court may have decided that estimates of unit recovery were too unreliable to submit. Moreover, class members with large claims had the sophistication to estimate an approximate amount they would secure from the settlements. It is unlikely that the smaller class members would have objected to the settlement (or opted out of the class) on the basis of unit recovery figures since their claims were small.[43] For these reasons, we do not believe the court abused its discretion by approving a notice without unit recovery figures. And while we think the notice would have been better had it included information that some class representatives thought the settlements inadequate, the failure to require such information was not an abuse of discretion.

Turning to the arguments that the notice should have summarized the opinions of the sheet-plant and state-law objectors, we agree with the settlement proponents that the district court then would have been bound to allow the proponents to respond. Inclusion of the objections and responses would have made the notice's neutrality difficult to maintain and may have become so detailed that the notice would "confuse class members and impermissibly encumber their rights to benefit from the action." *In Re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d at 1104. Thus, we hold that the district court acted within the limits of its discretion in approving the notice of these settlements.

## VI

### *Defendants and Contribution*

As recounted in the facts, Mead Corporation, the single non-settling defendant in this litigation, claims a right of contribution against the defendants who attempted to purchase their peace with the plaintiff classes. Two groups of defendants think this alleged right to contribution, if ultimately upheld, would entitle them to rescind their settlements under the doctrine of commercial frustration. Both groups of defendants believe this possible right to contribution was, at the time the court was considering final approval of the settlement, an interest the district court was duty-bound to protect. One group contends that the district court should have provided this protection by deferring final consideration of the settlements until the ultimate judicial pronouncement is made on Mead Corporation's right, if any, to contribution. See Brief for Certain Settling Defendants-Appellants (the Continental Group, Inc.) at 2. The second group believes the district court properly placed its final imprimatur on the settlements, but should have delayed distribution of the settlement proceeds until all issues concerning rights of recission were resolved. Brief for Settling Defendants-Appellants Owens-Illinois, Inc., etc. at 8. At this time, we hold only that the district court acted properly in deciding whether to approve the settlements when it did. We do not, in this opinion, reach the question whether the district court should have delayed distribution of the settlement proceeds, since this question will be mooted

---

**43.** Their interests, it goes without saying, were to be scrupulously protected by the court at the settlement hearings.

if the settlements are ultimately disapproved.[44] Our retained jurisdiction will permit us to review the question of distribution when the district court, on limited remand, complies with our request as iterated in Part II, *supra.*

▮▮▮▮ The argument that the district court should have delayed approving these settlements until the non-settling defendant's right of contribution is finally resolved is without merit. The district court's inherent power to manage the class action gives it the discretion to decide when to review the adequacy of a settlement. In exercising this discretion, the court's most important consideration is whether the proponents are ready to demonstrate that the settlement is fair, reasonable and adequate. If they are, the district court should proceed to consider the settlement at an early date, particularly when approval or disapproval bears on the interests of other parties who are preparing for trial. Here, as in other contexts, justice unnecessarily delayed can be justice diminished.

▮▮▮ The settling defendants, however, claim that the court could not determine whether the settlements were fair and reasonable as to *them* until the contribution claims were resolved. These defendants misconstrue the court's role in passing on the fairness, adequacy and reasonableness of a settlement. The reason the court is called on to review a settlement is to protect the rights of the many absent class members who were not involved in the negotiations leading to settlement. See *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971). A defendant who negotiates a settlement, however, does not need the court to act in a fiduciary role to protect its interest. The law provides other remedies if the settlement is legally objectionable from the defendant's standpoint—for instance, it can seek rescission.

Thus, defendants here, are wrong in claiming that the court abused its discretion in reviewing the settlements for final approval in December, 1979. If the defendants' interests in bringing a rescission action required protection, the court could have delayed distribution of the settlement proceeds. Whether the court had the duty to protect defendants' interests on rescission, and whether failing to exercise that duty was reversible error, is a question we reserve until the district court complies with out limited remand order.

## VII

### *Conclusion*

We conclude by summarizing our holdings:

(1) We affirm the district court's holding that the plaintiff negotiators did not have conflicts of interest that rendered them inadequate representatives of the subclasses;

(2) We affirm the district court's holding that the lack of pre-settlement discovery does not in itself invalidate the settlements;

(3) We affirm the district court's holding that it had the power to approve settlements that release defendants from federal *and* state claims;

(4) We affirm the district court's approval of the notice to the subclasses;

(5) We affirm the district court's decision to consider the settlements for final approval prior to judicial resolution of whether the non-settling defendant has a right to bring a contribution action against the settling defendants;

(6) We remand to the district court to enter more detailed findings and conclusions concerning the adequacy of all but the two "hardship settlements";

(7) We remand to the district court to enter more detailed findings and conclusions concerning the reasonableness of the formula by which the settlement proceeds for the pre-January 5, 1979, and the hardship settlements are to be distributed to subclass members;

---

**44.** *We consider whether the district court should have considered approving the settlements when it did because a negative answer* to this question would require us to vacate the order approving the settlements.

(8) We reserve judgment on whether the district court should delay distribution of the settlement proceeds until there is judicial resolution of the non-settling defendant's right to bring a contribution action against the settling defendants;

(9) We retain jurisdiction of this appeal pending the district court's compliance with our limited remand.

REMANDED with instructions.